TUCKER ELLIS LLP
Mollie F. Benedict – SBN 187084
mollie.benedict@tuckerellis.com
Ronie M. Schmelz – SBN 130798
ronie.schmelz@tuckerellis.com
Amanda Villalobos – SBN 262176
amanda.villalobos@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone: 213.430.3400
Facsimile: 213.430.3409

Attorneys for Defendants MCNEIL NUTRITIONALS, LLC and JOHNSON & JOHNSON

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

JOANN MARTINELLI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

JOHNSON & JOHNSON and McNEIL NUTRITIONALS, LLC,

Defendants.

Case No. Case No. 2:15-cv-01733-MCE-DB

**DEFENDANTS MCNEIL NUTRITIONALS, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.**

Date: December 14, 2017
Time: 2:00 p.m.
Judge: Hon. Morrison C. England, Jr.

[Filed concurrently with Memorandum of Points and Authorities; Declaration of Amanda Villalobos; [Proposed] Order; Defendants' Opposition to Plaintiff's Motion for Class Certification; Defendants' Motion to Exclude Expert Testimony of Colin B. Weir; Notice of Request to Seal Documents]

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.
1299266.4

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT on December 14, 2017 at 2:00 p.m., or as soon thereafter as this matter may be heard by the above-entitled court located at 501 I Street, Suite 4-200, Sacramento, California, 95814, Defendants McNeil Nutritionals, LLC and Johnson & Johnson will and hereby do move this Court for an order excluding the surveys, expert declaration, and testimony of Plaintiff's retained expert Dr. J. Michael Dennis.

Defendants' Motion to Exclude Plaintiff's Surveys and Expert Testimony J. Michael Dennis, Ph.D. is based upon this Notice, the accompanying Memorandum of Points and Authorities filed concurrently herewith, the Declaration of Amanda Villalobos and exhibits attached thereto, Defendants' Opposition Brief to Plaintiff's Motion for Class Certification filed concurrently herewith, the Motion to Exclude Expert Testimony of Mr. Colin B. Weir, the Rebuttal Declaration of Dr. Bruce Isaacson, the Rebuttal Declaration of Dr. Denise Martin, the Rebuttal Declaration of Dr. Scott D. Swain, any reply memorandum, the pleadings and files in this action, and such other matters as may be presented at or before the hearing.

DATED: October 2, 2017

TUCKER ELLIS LLP

By: /s/ Ronie M. Schmelz

Mollie F. Benedict - SBN 187084
mollie.benedict@tuckerellis.com
Ronie M. Schmelz – SBN 130798
ronie.schmelz@tuckerellis.com
Amanda Villalobos - SBN 262176
amanda.villalobos@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone:213.430.3400
Facsimile: 213.430.3409

Attorneys for Defendants MCNEIL NUTRITIONALS, LLC and JOHNSON & JOHNSON

2

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ....................................................................................................1

II. FACTUAL AND PROCEDURAL BACKGROUND.......................................................

A. Benecol® Products. ......................................................................................2

B. Plaintiff's Allegations. ....................................................................................2

C. The Process Employed in the Dennis Surveys. .............................................3

III. LEGAL STANDARDS ..........................................................................................6

A. Expert Witness Opinions Are Admissible Only If They Are Relevant and Reliable. ...........................................................................................................6

B. The Standard for Survey Reliability Under *Daubert*. .......................................7

IV. ARGUMENT ........................................................................................................7

A. The Dennis Surveys' Results Are Irrelevant Because They Are Not Probative of the Claims at Issue in This Case. ...............................................................7

**1.** The results of the Dennis Surveys are inherently unreliable because they include few putative class members. ................................................8

**2.** The Surveys were conducted under unrealistic conditions that do not remotely resemble marketplace conditions during the proposed class period. ........................................................................................................12

B. The Conclusions Reached by Dennis are Unreliable Because The Surveys Inflate the Importance of the Trans Fats Claims on Benecol Labels. ......................15

C. The Dennis Surveys Suffer From Other Methodological Flaws that Are Fatal to Their Admissibility. ......................................................................................16

V. CONCLUSION......................................................................................................18

i

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.
1299266.4

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Berk v. St. Vincent's Hospital and Medical Center*,
380 F. Supp.2d 334 (S.D.N.Y. 2005) .......... 18

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*,
627 F. Supp. 2d 384 (D.N.J. 2009) .......... 12

*Brazil v. Dole Packaged Foods, LLC*,
No. 12-CV-01831-LHK, 2014 WL 5794873 (N.D. Cal. Nov. 6, 2014) .......... 16

*Cholakyan v. Mercedes-Benz USA, LLC*,
281 F.R.D. 534 (C D. Cal. 2012) .......... 6

*Chrysler Corp. v. Vanzant*,
44 F. Supp. 2d 1062 (C.D. Cal. 1999) .......... 11

*Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*,
383 F.3d 110 (3d Cir. 2004) .......... 8

*Clicks Billiards, Inc. v. Sixshooters, Inc.*,
251 F.3d 1252 (9th Cir. 2001) .......... 7

*Daubert v. Merrell Dow Pharms.*,
509 U.S. 579 (1993) .......... 1, 6, 7, 11

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .......... 6

*Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*,
618 F.3d 1025 (9th Cir. 2010) .......... 7

*Gibson v. Cnty. of Riverside*,
181 F. Supp. 2d 1057 (C D. Cal. 2002) .......... 7

*Hodgdon Powder Co. v. Alliant Techsystems, Inc.*,
512 F. Supp. 2d 1178 (D. Kan. 2007) .......... 16

*In re AutoZone, Inc.*,
289 F.R.D. 526 (N.D. Cal. 2012) .......... 6

*In re Conagra Foods, Inc.*,
90 F. Supp. 3d 919 (C.D. Cal. 2015) .......... 15

*In re NJOY, Inc. Consumer Class Action Litig.*,
120 F. Supp. 3d 1050 (C.D. Cal. 2015) .......... 16

*In re POM Wonderful LLC*,
No. ML 10-02199 DDP (RZx), 2014 WL 1225184 (C.D. Cal. Mar. 25, 2014) .......... 16

*Instant Media, Inc. v. Microsoft Corp.*,
2007 WL 2318948 (N.D. Cal. Aug. 13, 2007) .......... 12

ii

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

*James Burrough Limited v. Sign of the Beefeater, Inc.*, 540 F.2d 266 (7th Cir. 1976) ........ 16

*Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164 (N.D. Cal. 2015) ........ 6, 7

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. 12-3762, 2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ........ 11

*Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........ 12

*Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No.02-3691, 2004 WL 326708 (S.D.N.Y. Feb. 23, 2004) ........ 8

*Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224 (N.D.N.Y. Sept. 28, 2000) ........ 18

*Obrey v. Johnson*, 400 F.3d 691 (9th Cir. 2005) ........ 6

*Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866 (C.D. Cal. 2013) ........ 1, 8, 11

*Santoro v. Donnelly*, 340 F. Supp.2d 464 (S.D.N.Y. 2004) ........ 18

*Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477 (5th Cir. 2004) ........ 8

*Sirko v. IBM*, No. CV 13-03192 DMG (SSx), 2014 WL 4452699 (C.D. Cal. Sep. 3, 2014) ........ 6, 7

*Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302 (N.D. Ga. 2008) ........ 8, 12

*Tokidoki, LLC v. Fortune 10 Dynamic, Inc.*, No. CV 07–1923 DSF (PJWx), 2009 WL 2366439 (C.D. Cal. 2009) ........ 14

*Universal City Studios, Inc. v. Nintendo Co.*, 746 F.2d 112 (2d Cir. 1984) ........ 12

*WalMart Stores, Inc. v. Dukes*, [564 U.S. 338 (2011) ........ 6

*Wells Fargo & Co. v. WhenU.com*, Inc., 293 F. Supp. 2d 734 (E.D. Mich. 2003) ........ 8, 12

**RULES**

Fed. R. Evid. 702 ........ 6

iii

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

**OTHER AUTHORITIES**

*Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence (3rd ed. 2011) .. 9, 16

*Tests of properly conducted survey—Examples of methodological deficiencies*, McCarthy on Trademarks and Unfair Competition (5th ed. 2017)........................................................................ 12

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

iv

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In her Motion for Class Certification, Plaintiff JoAnn Martinelli relies almost exclusively on a declaration prepared by one of her experts, Dr. J. Michael Dennis (the "Dennis Declaration"), to establish a price premium for the "No Trans Fat" and "No Trans Fatty Acids" on the labels of Benecol Spreads and Benecol Light Spread, which she alleges are false and misleading. Dr. Dennis' opinions are, in turn, based on surveys he conducted (the "Dennis Surveys"). The Dennis Surveys, however, were not conducted in accordance with recognized and accepted scientific principles, and his opinions based thereon are subject to exclusion under the standard articulated in *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993), for several reasons.

As a preliminary matter, the Dennis Surveys should be ignored because they are neither relevant to the issues to be decided on class certification nor probative of the opinions of putative class members—California residents who purchased Benecol from January 1, 2008 to December 31, 2011. Not only do the Dennis Surveys canvas opinions of respondents who primarily reside outside of California, but they also fail to account for whether the respondents purchased Benecol or some other cholesterol-reducing spreads; includes respondents that purchased products outside the class period; and only includes respondents over the age of 50. In addition, the Dennis Surveys fail to account for consumer perceptions of trans fat, which have evolved significantly since the end of the putative class period.[1]

The Dennis Surveys are also inadmissible because they do not reliably measure the materiality of the trans fat label statements and fail to accurately calculate what premium, if any, is properly attributable to these claims. Courts in this Circuit routinely reject similar price-premium damages models where, as here, they fail to capture variables or attributes that may explain a price difference.

---

[1] *See, e.g.*, *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013) (excluding survey that was not conducted "according to accepted scientific principles" because "there is no indication that the survey population had any relationship to the relevant population of Sketchers consumers. . . . These inadequacies speak not merle to the weight that should be accorded to the survey, but rather to the fundamental reliability of Luntz's approach.").

1

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

Finally, Dennis' survey-based opinions should be excluded because they fail to meet recognized and accepted standards for clear, precise and unbiased questions. Many of the questions were difficult to answer as they contained hopelessly vague, undefined and confusing terms.

The numerous and extensive flaws in the Dennis Surveys and the expert testimony of Dennis that flows from those Surveys are irreparable and command exclusion.[2]

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. Benecol Products.

Benecol Spread and Benecol Light Spread (collectively, "Benecol Spreads" or "Benecol") were butter/margarine substitutes sold by McNeil Nutritionals, LLC ("McNeil") between 1999 and 2015. Benecol contained plant stanol esters, patented ingredients proven to lower total cholesterol and low-density lipoprotein ("LDL") cholesterol.

Benecol also contained a small amount of partially hydrogenated oils ("PHO"), as stated on their labels in accordance with Food and Drug Administration ("FDA") regulations. As Defendants have explained in greater detailed in their Opposition to Plaintiff's Motion for Class Certification, Defendants representated that Benecol contained "No Trans Fat" and "No Trans Fatty Acids" consistent with FDA regulations that *required* Defendants to list the content of trans fat in Benecol as zero. *See* Defs' Opposition at 1-2. The trans fat statements were removed from the labels by the end of 2011.

### B. Plaintiff's Allegations.

Plaintiff, a California resident, alleges she purchased Benecol based on the allegedly false and misleading statements that they contain "No Trans Fat" and "No Trans Fatty Acids," and are generally recognized as safe for human consumption. *See* First Amended Complaint ("FAC") ¶¶ 3, 7, 12. She fails, however, to allege which products she purchased, the dates of her purchases, or where she purchased the products; nor does she identify the labels she purportedly relied upon in making her decision to purchase Benecol instead of other products. Although she alleged in her Complaint claims based on both a national class and on a California sub-class, this Court held in May 2017 that Plaintiff

[2] Defendants file concurrently herewith a Motion to Exclude Expert Testimony of Mr. Colin B. Weir, Plaintiff's other expert proffered in support of her motion for class certification. Weir's testimony is based exclusively on the Dennis Declaration and Surveys and, for all of the reasons stated herein, should also be excluded.

2

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

could not pursue claims beyond those alleged on behalf of California consumers. *See* May 2017 Order, ECF Doc. 78 at 10-11.

**C. The Process Employed in the Dennis Surveys.**

According to the Dennis Declaration, the target for the Dennis Surveys were "U.S. adult residents age 50 and over who had purchased a cholesterol-lowering spread in the past ten years…". *See* Declaration of J. Michael Dennis, Ph.D. in Support of Plaintiff's Motion for Class Certification ("Dennis Declaration") at 6. Screening questions in the Dennis Surveys qualified prospective respondents, among other criteria, based on the following:

i. conducting all or most of the grocery shopping for their household;

ii. age 50 or older;

iii. having purchased "Butter or margarine substitute" for personal use within the past 10 years;

iv. having purchased "Spreads (from vegetable oil)" as "a substitute for butter or margarine";

v. identifying that "Spreads (from vegetable oil)" normally come in a "Plastic Tub";

vi. having purchased vegetable oil spreads in the last 10 years that specifically claim "lower or reduce cholesterol," "support healthy cholesterol levels," and/or "helps maintain a healthy heart"; and

vii. having made the first purchase of "this type of cholesterol lowering or healthy heart spreads" at any time other than "Never."

*See Id*. at 43-50. After qualification, but before they were assigned to either the conjoint survey or the consumer perceptions survey, respondents were shown the following instruction:

> This survey asks questions about what people like or do not like about spreads that specifically claim to lower cholesterol or support healthy levels of cholesterol.
>
> All these spreads are alternatives to regular butter or margarine.
>
> These spreads are different from other kinds of spreads that do not claim to lower or support healthy levels of cholesterol.

*Id*. at 50.

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

Next, respondents were asked a question regarding their understanding of this instruction, and whether they agreed to complete the survey on their own. *Id.* Qualified respondents were randomly assigned to either the conjoint survey or consumer perceptions survey. *Id.* at 51.

The conjoint survey measured the effect of five product attributes relating to "cholesterol-lowering spreads." Each attribute had the following levels:

| Attribute | Levels |
|---|---|
| Size | 8-ounce tub<br>15-ounce tub |
| Vegetable Oil Percentage | 39% of the product<br>55% of the product |
| Supplemental Ingredient | Plant Stanol Esters<br>Plant Sterols |
| Product Descriptions on Front of Package | No Trans Fat<br>No Trans Fatty Acids<br>Buttery Spread<br>Light<br>Light Spread<br>Proven to Reduce Cholesterol<br>Omega 3<br>Supports Healthy Cholesterol Levels<br>50% Less Calories than Butter<br>Non-GMO |
| Price (not including tax or shipping) | For the 8-ounce tub, 7 prices from $2.50 to $5.50<br>For the 15-ounce tub, 7 prices from $3.50 to $6.50 |

*Id.* at 56.

In the conjoint survey, after initial instructions, respondents were shown an image providing either a Light or Regular version of "Nutrition Facts and Directions," and were given additional directions. *Id.* at 53. Respondents were told to assume that "… each spread has the <u>same</u> Nutrition Facts and Directions," and also to "Assume each spread is the same as the cholesterol-lowering spread you usually buy in regards to <u>taste</u>, <u>consistency</u> and <u>texture</u>, and <u>how it cooks</u>." *Id.*

4

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

In the main part of the conjoint survey, respondents completed 12 "choice tasks." *Id*. at 14. Each task involves selecting the combination of attributes and levels preferred among three different combinations, or selecting "None of these." *Id*. at 16-17.

Based on the conjoint survey, Dennis concluded that the premium solely attributable to the "No Trans Fat" claim was 20.8% of the $4.80 price paid by consumers, or $1.00. *Id*. at 7. He also concluded that the premium solely attributable to the "No Trans Fatty Acids" claim was 22.9% of the $4.80 price paid by consumers, or $1.10. *Id*. at 24-25.

The consumer perceptions survey was administered to a group of respondents separate from those who took the conjoint survey, and consisted of only two survey questions. *Id*. at 59-61.

In the first question, respondents were informed, "We want to know about your preferences and expectations for cholesterol-lowering spreads that are a substitute for regular butter or margarine." *Id*. Initial instructions told respondents, among other directions, ". . . to think back to what was important to you the last time you purchased a cholesterol-lowering spread." *Id*. The first question in the consumer perceptions survey shows descriptions of two cholesterol-lowering spreads and asks, "Which of these two cholesterol-lowering spreads would you purchase? The two products are the same in every way except for a difference on the product label.." *Id*.

A table of descriptions indicate that "Product A" and "Product B" are shown as "Same" on attributes including Brand, Size, Cholesterol Lowering, Taste, Texture, Calories, and Saturated Fats. *Id*. Under "Label about Trans Fats," Product A is described as "Does not have 'No Trans Fats' label," while Product B is described as "Has 'No Trans Fats' label." *Id*. Respondents were asked to select Product A, Product B, or to indicate that they don't know or are not sure. *Id*.

The second and final question in the consumer perceptions survey asks respondents:

> Suppose a cholesterol-lowering spread has this information on the product packaging.
>
> The front of the package says: **No Trans Fats**
>
> The back of the product says: **No Trans Fatty Acids**
>
> In your opinion, how much **trans fat** does this product have or not have?

*Id*. at 61. The response options for the second question includes, "Does not contain any Trans Fat," "Contains a small amount of Trans Fat," and "Don't know / Not sure." *Id*.

5

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

Based on the two questions in the consumer perceptions survey, Dennis concludes that purchasers are "almost unanimous in preferring the cholesterol-lowering spread with the 'No Trans Fat' label," with only 6.4% of respondents preferring the product that does not have this claim. *Id*. at 29. Dennis also concludes that 66.8% of respondents believe the labels meant the product does not contain any trans fat, while 19.2% believe it meant the products contain a small amount of trans fat. *Id*. at 30.

**III. LEGAL STANDARDS**

**A. Expert Witness Opinions Are Admissible Only If They Are Relevant and Reliable.**

Rule 702 of the Federal Rules of Evidence permits expert opinions based on scientific, technical, or other specialized knowledge, *if* the evidence will assist the fact finder, and *if* it is (1) based upon "sufficient facts or data," (2) "the product of reliable principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 589 (1993). When considering a motion "to exclude expert testimony or reports at the class certification stage, courts apply the *Daubert* standard to evaluate the challenged evidence." *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 176 (N.D. Cal. 2015) (citing *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011)). At the class certification stage, the district court must determine "whether the expert evidence is sufficiently probative to be useful in evaluating whether class certification requirements have been met." *Sirko v. IBM*, No. CV 13-03192 DMG (SSx), 2014 WL 4452699, at *6 (C.D. Cal. Sep. 3, 2014).

District courts in the Ninth Circuit consistently examine expert testimony to ensure it complies with the *Daubert* standard at the class certification stage. *See Kamakahi*, 305 F.R.D. at 176; *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 541-42 (C D. Cal. 2012) (excluding expert for the purposes of class certification and noting that "after [*WalMart Stores, Inc. v.] Dukes*, [564 U.S. 338 (2011)] the Ninth Circuit approved the application of *Daubert* to expert testimony presented in support of or opposition to a motion for class certification"); *In re AutoZone, Inc.*, 289 F.R.D. 526, 545 (N.D. Cal. 2012) (striking expert testimony and survey at the class certification stage that did not comport with *Daubert* standards); *see also Dukes*, 564 U S. at 354 (expressing doubt that *Daubert* standard did not apply at the class certification stage). Expert evidence that suffers from serious methodological flaws is unreliable and inadmissible. *Obrey v. Johnson*, 400 F.3d 691, 696 (9th Cir. 2005); *see also Kamakahi*,

6

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.
1299266.4

305 F.R.D. at 176. The relevance prong is not a one-size-fits-all analysis, rather the court must determine whether the evidence "fits" the particular issues of each case. *Kamakahi*, 305 F.R.D. at 176 ("scientific validity for one purpose is not necessarily scientific validity for other, unrelated purposes") (citing *Daubert*, 509 U.S. at 591).

**B. The Standard for Survey Reliability Under *Daubert*.**

Surveys are admissible only if the proponent can demonstrate that it is (1) "conducted according to accepted principles;" and (2) "is relevant." *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d 1025, 1036 (9th Cir. 2010) (internal marks omitted). The admissibility of the survey is a threshold question that must be determined by the judge through its gatekeeping function. *See Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001) ("Treatment of surveys is a two-step process. First, is the survey admissible? That is, is there a proper foundation for admissibility, and is it relevant and conducted according to accepted principles? This threshold question may be determined by the judge") (internal citations omitted). Furthermore, substantial deficiencies in the design or execution of a survey are grounds for its complete exclusion. *Gibson v. Cnty. of Riverside*, 181 F. Supp. 2d 1057, 1067 (C D. Cal. 2002) (finding survey inadmissible based on substantial and fundamental deficiencies, including that survey respondents were informed of the purpose of the survey and reminded that they were the beneficiaries of the survey).

For the reasons discussed below, the Dennis Surveys do not, and cannot, satisfy these threshold requirements, and therefore the Dennis Report and Surveys should be excluded in their entirety.

**IV. ARGUMENT**

**A. The Dennis Surveys' Results Are Irrelevant Because They Are Not Probative of the Claims at Issue in This Case.**

It is axiomatic that for a survey to be relevant to a plaintiff's claims it must adequately represent opinions relevant to the litigation. *See Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt., Inc.*, 618 F.3d at 1036 (proponent of survey must demonstrate the survey's relevance to the claims in the litigation); *Sirko v. IBM*, 2014 WL 4452699, at *6 (C.D. Cal. Sep. 3, 2014) (noting that district court must determine whether expert evidence is sufficiently probative to be useful in evaluating plaintiff's class claims). Here, the results of the Dennis Surveys have absolutely no bearing on the appropriateness

TUCKER ELLIS LLP
Cleveland ◆ Columbus ◆ Denver ◆ Los Angeles ◆ San Francisco

of class certification because respondents were not screened, let alone determined to be—and for the most part are not—representative of Plaintiff's putative class of consumers who purchased Benecol from January 1, 2008 to December 31, 2011.

**1. The results of the Dennis Surveys are inherently unreliable because they include few putative class members.**

Courts across the country, including California have held that for a survey to be a reliable basis for an expert's opinion, the population of respondents must be tailored to reflect the opinion the expert commissioning the survey seeks to provide. Here, however, the population of respondents to Dr. Dennis' surveys do not match the opinion he seeks to provide for class certification purposes, rendering it irreparably flawed and requiring its exclusion. *See*, *e.g.*, *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013), (excluding survey that was not conducted "according to accepted scientific principles" because "there is no indication that the survey population had any relationship to the relevant population of Sketchers consumers. . . . [t]hese inadequacies speak not merle to the weight that should be accorded to the survey, but rather to the fundamental reliability of Luntz's approach."); *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) (requiring that "the persons interviewed . . . adequately represent the opinions which are relevant to the litigation" for a survey to be valid); *Citizens Financial Group, Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 119-20 (3d Cir. 2004)(excluding survey for fatal flaws including because it failed to capture party's actual customer base; "A survey of the wrong 'universe' will be of little probative value in litigation" and survey proponent "bears the burden of proving that the universe is proper."); *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No.02-3691, 2004 WL 326708, at *8 (S.D.N.Y. Feb. 23, 2004) (same); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008) (the "[s]election of the proper universe [of survey respondents] is one of the most important factors in assessing the validity of a survey."); *Wells Fargo & Co. v. WhenU.com*, Inc., 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003) (It "is so critical," in fact, "that even if the proper questions are asked in a proper manner, . . . the results [of a survey of an improper universe of respondents] are likely to be irrelevant.").

8

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

TUCKER ELLIS LLP
Cleveland ◆ Columbus ◆ Denver ◆ Los Angeles ◆ San Francisco

Plaintiff purports to seek certification of a putative California class of Benecol purchasers and a multi-state express warranty class.[3] This Court, however, already ruled that Plaintiff can only pursue claims on behalf of *California* purchasers. *See supra*, at 1-2; *also* Defs Opp. to Pl's Mot. For Class Certification at 2. In its May 2017 Order, the Court granted Defendants' motion to deny nationwide class certification and struck Plaintiff's class allegations; only the California sub-class survives. *Id*. Accordingly, the *only* consumers whose opinions are potentially relevant to Plaintiff's claims are California residents who purchased Benecol during the 4-year class period, January 1, 2008 to December 31, 2011.[4] Less than 10% of the respondents in the Dennis Surveys were California residents. *See* Rebuttal Report of Bruce Isaacson ("Isaacson") at ¶ 41.

It is a well-accepted scientific principle that when conducting surveys, the target population should consist of individuals "whose characteristics or perceptions the survey is intended to represent." Shari Seidman Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence (3rd ed. 2011), at 235, attached as Ex. K to the Declaration of Amanda Villalobos ("Villalobos Dec."). The Dennis Surveys ignore this well-established principle and instead solicited and drew participants from all 50 states and the District of Columbia, even though California is the *only* relevant state for purposes of Plaintiff's Motion for Class Certification. More than 90% of the surveys' respondents were non-California residents, who do not qualify as members of the putative class. *See* Isaacson at ¶ 41. The percentage of relevant responses is patently insufficient to adequately measure the reaction of putative class members to the advertisements at issue in this case. Surprisingly, Dr. Dennis provides no rationale for his inclusion of irrelevant responses from non-California respondents, nor does he explain why the opinions of these foreign consumers support Plaintiff's claims here.[5]

---

[3] Plaintiff seeks certification of a "Multi-State Express Warranty" class comprised of consumers who purchased Benecol in California, Delaware, District of Columbia, Kansas, Missouri, New Jersey, Ohio, Utah, Virginia, and West Virginia. *See* Pl's Mot. at 4.

[4] As discussed in Defendants' Opposition to Plaintiff's Motion for Class Certification, Plaintiff can only represent putative class members whose claims arose on or after August 14, 2011, i.e. four years before she initiated this lawsuit because any claims before this date are barred by the statute of limitations. DE Opp. to Class Certification at pp. 6-8. Thus, at best, the class period for which Plaintiff can seek certification is the exceptionally narrow period between August 14, 2011 and December 31, 2011.

[5] Plaintiff may argue it was appropriate to survey non-California residents because she also seeks a multi-state express warranty class. Plaintiff, however, never before alleged a multi-state warranty class. And even if she were permitted to pursue one, her argument does not salvage the surveys because over

9

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ◆ Columbus ◆ Denver ◆ Los Angeles ◆ San Francisco

In addition to ignoring the geographic limitations of Plaintiff's putative class, the Dennis Surveys also ignore the temporal restriction of the putative class. Plaintiff seeks to certify classes of consumers who purchased Benecol from January 1, 2008 through December 31, 2011. The Dennis Surveys, however, include respondents who purchased a cholesterol-lowering spread during the 10 years preceding the August 2017 Surveys. No attempt was made, and no showing is made, that respondents purchased Benecol during the putative class period, and in fact the Surveys reveal that over 45.9% purchased a Spread for the first time during the last five years. *See* Isaacson at ¶ 38. As a result, nearly half of the 1,149 surveys' respondents did not purchase any butter or margarine substitutes (let alone Benecol) during the class period. Instead, their purchases were made between (1) August and December 2007; and (2) January 2012 and August 2017—periods that are well outside the putative class period.

The Dennis Surveys also fail to focus on the products at issue in this case. Indeed, the surveys' prompts made no mention of Benecol Spreads, and thus include responses from consumers that purchased *any* cholesterol-lowering spreads during periods of time that fall well outside the class period. Dr. Dennis did not recruit participants who purchased Benecol, and indeed never inquired what brand or type of cholesterol-lowering spread respondents purchased. Respondents were only asked whether they purchased a cholesterol-lowering butter or margarine substitute that consisted of a spread from vegetable oil and came in a plastic tub. *Id*. at ¶ 33. The Dennis Surveys never inquire whether respondents ever purchased Benecol. *Id*. at ¶ 34. The surveys' lax definition of eligible participants means Dr. Dennis' results could encompass purchasers of any one of over nine other butter or margarine substitute brands, including Promise active® Light Spread, Smart Balance Buttery Spreads, Land O Lakes® Fresh Buttery Spreads or County Crock® Original or Light Spreads. *Id*. Dr. Dennis attempts to overcome this fatal flaw by asserting, without any support, that the responses of non-Benecol purchasers are relevant because consumers of one brand category (such as Benecol) are representative of consumers of the overall category (i.e. cholesterol-lowering spreads). *Id*. ¶ 36. But in reality, marketers have long recognized that the reverse is true, *i.e.*, a single product category can contain different consumer

---

77% of respondents reside in states that do not fall into *either* the California or the multi-state putative class. *See* Dennis Declaration at 122-23.

10

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

segments that vary in how the products are used, the needs and preferences the products satisfy, and consumers' consumption patterns. *Id*.

The foregoing flaws in the Dennis Surveys are compounded by the fact that Dr. Dennis inexplicably limits the surveys' participants to consumers over the age of 50, a limitation that is absent from the putative class definition. *Id*. at ¶ 39. This limitation is entirely arbitrary as it is possible that a consumer younger than 50 could have purchased Benecol or any other cholesterol-lowering spread. This age limitation is also contradicted by the evidence, which establishes that the primary Benecol consumer was 55 years old or older. *Id*. at ¶ 40. Even if Dennis had a plausible explanation for limiting the age of the surveys' participants, the significant time lapse between the end of the class period and the date of the Surveys leaves an age gap between the Surveys' respondents and putative class members. *Id*. To illustrate, a class member who was 50 years old at the end of the class period in 2011 would correspond to a Survey respondent who is 56 years old in 2017. *Id*. The Dennis Surveys indicate that 52% of respondents were 50 to 64 years old. *See id*. Thus, if respondents ages were distributed equally across this 15-year age range, over 20% of respondents would have been younger than 50 years old in 2011, and thus fall outside both Benecol's primary target market and the consumers in the Dennis Surveys. *Id*.

The foregoing establishes that respondents who participated in the Dennis Surveys bear no resemblance to putative class members, rendering the Surveys' results irredeemably unreliable and subject to exclusion. *See Daubert v. Merrell Dow Pharms.*, 509 U.S. at 589; *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, No. 12-3762, 2014 WL 572290, at *4 (N.D. Cal. Feb. 11, 2014) ("To assess the validity and reliability of a survey, a court should consider a number of criteria, including whether: (1) the proper universe was examined and the representative sample was drawn from the universe…."); *Reinsdorf v. Skechers U.S.A.*, 922 F. Supp. 2d 866, 878 (C.D. Cal. 2013), (excluding survey that was not conducted "according to accepted scientific principles" because "there is no indication that the survey population had any relationship to the relevant population of Sketchers consumers. . . . [t]hese inadequacies speak not merle to the weight that should be accorded to the survey, but rather to the fundamental reliability of Luntz's approach."); *Chrysler Corp. v. Vanzant*, 44 F. Supp. 2d 1062, 1078 (C.D. Cal. 1999) (wrong or under-inclusive universe has little, if any, probative value); *Universal City*

11

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

*Studios, Inc. v. Nintendo Co.*, 746 F.2d 112, 118 (2d Cir. 1984) ("'To be probative and meaningful . . . surveys . . . must rely upon responses by potential consumers of the products in question.'").[6]

**2. The Surveys were conducted under unrealistic conditions that do not remotely resemble marketplace conditions during the proposed class period.**

In addition to being primarily comprised of respondents who are not members of the putative class, the conditions under which the Dennis Surveys were conducted fail to correlate to real-world marketplace conditions that existed during the class period (or even exist today) and provide no useful information regarding how the allegedly misleading label claims were reviewed and considered by putative class members.

In assessing whether a consumer perceptions study accurately reflects the attitudes of target consumers, courts consider the extent to which the survey replicates the real-world setting. *See, e.g., Instant Media, Inc. v. Microsoft Corp.*, 2007 WL 2318948, at *15 (N.D. Cal. Aug. 13, 2007) ("To have substantial probative value, a survey, in addition to testing the proper universe, must also be designed to examine the impression presented to the consumer of the accused product.") (internal quotations omitted); *Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 591-92 (S.D.N.Y. 2007) ("A survey that uses a stimulus that makes no attempt to replicate how the marks are viewed by consumers in real life may be excluded on that ground alone."); *Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 452-53 (D.N.J. 2009) (survey that "withheld from the respondents large amounts of other essential visual, contextual and informational portions" had "no probative value"). This inquiry includes an assessment of how closely the attitudes of the survey participants reflect the members of the proposed class. *See* J. Thomas McCarthy, *§32:171: Tests of properly conducted survey—Examples of methodological deficiencies*, in McCarthy on Trademarks and Unfair Competition (5th ed. 2017) at 2

[6] *See also, e.g.*, *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 487 (5th Cir. 2004) (requiring that "the persons interviewed . . . adequately represent the opinions which are relevant to the litigation" for a survey to be valid); *Mastercard Int'l Inc. v. First Nat'l Bank of Omaha, Inc.*, No.02-3691, 2004 WL 326708, at *8 (S.D.N.Y. Feb. 23, 2004) (same); Fed. Judicial Center, Reference Manual on Scientific Evidence 364, 362 (3d ed. 2011) (discussing the importance of selecting the proper universe of survey respondents); *Smith v. Wal-Mart Stores, Inc.*, 537 F. Supp. 2d 1302, 1323 (N.D. Ga. 2008) (the "[s]election of the proper universe [of survey respondents] is one of the most important factors in assessing the validity of a survey."); *Wells Fargo & Co. v. WhenU.com*, Inc., 293 F. Supp. 2d 734, 767 (E.D. Mich. 2003) (It "is so critical," in fact, "that even if the proper questions are asked in a proper manner, . . . the results [of a survey of an improper universe of respondents] are likely to be irrelevant.").

12

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

("[W]here the critical date to determine secondary meaning was some years in the past, a survey taken today should not be ignored, but should be given whatever weight the decision-maker thinks is appropriate"), attached as Ex. L to Villalobos Decl.

Here, the Dennis Surveys' unrealistic and flawed research methodologies fail to accurately replicate marketplace conditions in which putative class members viewed Benecol. First, the consumer perceptions portion of Dennis's Surveys asked about product attributes and combinations of statements that *never* appeared on Benecol labels and do not correspond to any other Spreads sold during the class period, *e.g.* references to non-GMO and Omega-3. *See* Isaacson, ¶ 59. These other attributes may have been less relevant, less important, or never used on spread labels during the putative class period and the Dennis Declaration fails to explain why these attributes were tested or how they inform consumers' perception of statements actually made on Benecol labels. *Id.* ¶ 58.

Second, in his conjoint survey, Dr. Dennis ignores the "Proven to Reduce Cholesterol" statement, which was dominantly displayed on the Benecol labels and was the sole emphasis of McNeil's marketing campaign during the class period. *Id.* at ¶ 61. Rather, the survey places an inordinate emphasis on trans fat statements and package sizes while ignoring attributes and qualities that were known to be relevant to consumers during the class period, *e.g.*, healthy alternatives to butter, spreads with an appealing taste and texture that offered better nutrients than butter, lower saturated fat and sodium content, and/or fewer calories. *Id.* ¶ 49-66. Third, the surveys also fail to present respondents with the option of choosing between actual spread product labels, and instead rely solely on fabricated written tables of attributes, a presentation consumers would never encounter in the real marketplace. *Id.* ¶ 74-77. The lack of a nexus between the Surveys' conditions and the actual consumer environment during the putative class period irreparably undermines the credibility of Surveys' results.

Finally, the consumer climate relating to trans fats that exists today bears little resemblance to consumer attitudes during the putative class period, which commenced nearly a decade ago. The Dennis Surveys were conducted in August 2017, by which time awareness of and attitudes toward trans fats had developed dramatically since the class period ended in December 2011. *See id.*, ¶ 44. As detailed in the Isaacson Report, the number of news articles discussing trans fats has increased every year since 2011, with more than 116,000 published after the end of the class period; while the number of scholarly

13

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

articles related to trans fats published since the end of the class period is well in excess of 220,000. *Id.* at ¶ 47. The increasing news and other reporting about trans fats since the class period ended, which has become markedly more negative, patently influences consumers' attitudes and behaviors towards trans fats over time. *Id.* at ¶¶ 44, 48.[7] In a 2007 survey, 92% of respondents said they had heard of trans fats, but only 21% could name the food sources for trans fats, and only 37% said they were buying products because they contained no trans fats. *Id.* ¶ 53. Similarly, in a 2009 survey, 53% of U.S. respondents said they were confused about fats, and 69% said they were getting conflicting messages about trans fats from the government, experts, food companies, and media. *Id.* While it is true that consumer surveys conducted after class members have undertaken certain market activities do not automatically disqualify the surveys, where, as here, the evidence clearly demonstrates a material change in attitudes towards the variable that is purportedly being tested (*i.e.*, trans fats), the Surveys and opinions derived therefrom should be afforded no weight. *See Tokidoki, LLC v. Fortune 10 Dynamic, Inc.*, No. CV 07–1923 DSF (PJWx), 2009 WL 2366439, at * 14 (C.D. Cal. 2009) (the survey was so flawed the results were "not credible and deserve little or no weight").

The *1-800 Contacts, Inc. v. Lens.com, Inc.* court also excluded a survey that failed to accurately reflect the relevant consumer population. No. 07-591, 2010 WL 5186393, at *6-*7 (D. Utah Dec. 15, 2010). While the survey questioned "individuals who had purchased contacts within the prior twelve months or who intended to purchase contacts within the next twelve months," the relevant universe was "consumers who purchase contacts on the Internet." *Id.* at *6. Because "the survey questions did not limit respondents only to those who purchased contacts on the Internet," the court concluded that the "survey universe was improper" and excluded the survey as unreliable. *Id.* at *6-*7. Similarly, because the Dennis Surveys are not representative of the putative class and fail to account for the significant evolution of consumer perceptions towards trans fats since the end of the class period, they neither survey putative class members in a meaningful fashion nor meet the minimum requirements of *Daubert* for admissibility.

---

[7] Dennis attempts to belittle the increased public awareness of trans fats in his Declaration by presenting an incomplete timeline of trans fat related events ending in 2008. *See* Isaacson at ¶ 44. Reliance on these truncated events is as unpersuasive as it is disingenuous.

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

**B. The Conclusions Reached by Dennis are Unreliable Because The Surveys Inflate the Importance of the Trans Fats Claims on Benecol Labels.**

The Dennis Surveys are inadmissible because they do not reliably measure the materiality of the trans fats statements on Benecol labels and fail to accurately calculate what premium, if any, can be attributed to these claims.

Although the Surveys measured some spread attributes, other than the trans fats claim, respondents were expressly instructed *not* to consider other important attributes that would undoubtedly have influenced their purchasing decisions, *i.e.*, nutritional facts, ingredients, consistency, and cooking utility. *See* Isaacson at ¶ 64. Moreover, respondents were never asked to consider or rank the importance of other spread attributes, including, in the case of Benecol, their cholesterol-lowering abilities and presence of plant stanol esters, which were the exclusive focus of McNeil's marketing efforts and Benecol's differentiating characteristic. *Id*. at ¶ 65. The Dennis Surveys also fail to inquire, let alone consider, the extent to which consumers are willing to pay extra for a no trans fats product, whether they favored other product attributes, such as taste or texture, over the no trans fats claims, or any other ways in which they might change their behavior in a real world marketing situation. *Id*. at ¶ 49. In addition, the conjoint survey inflates the importance of the no trans fats claims by overemphasizing the no trans fats statements and inquiring about products Defendants never sold, e.g., 16-ounce spreads. *Id*. at ¶ 59. Accordingly, the strength and importance of the no trans fats claims were never reliably assessed or measured. *Id*. at ¶ 65.

Courts throughout the country, and especially in the Ninth Circuit, routinely reject price-premium models like the one presented here because they fail to capture variables or attributes that may explain a price difference. For example, in *In re Conagra Foods, Inc.*, 90 F. Supp. 3d 919, 1024-25 (C.D. Cal. 2015), a price premium model put forth by Weir, Plaintiff's other expert here, was rejected by the court because in calculating the premium he attributed to the term "100% Natural," Weir failed to isolate that premium from "multiple possible characteristics that consumers associate with a 'natural' label." *Id.* at 1024. Other district courts in California have similarly rejected attempts to base damages calculations on unreliable models that do not accurately measure the price premium attributable to a specific characteristic. *See In re POM Wonderful LLC*, No. ML 10-02199 DDP (RZx), 2014 WL

TUCKER ELLIS LLP
Cleveland ◆ Columbus ◆ Denver ◆ Los Angeles ◆ San Francisco

1225184 (C.D. Cal. Mar. 25, 2014) (rejecting expert's price-premium model because he "made no attempt, let alone an attempt based upon a sound methodology, to . . . answer the critical question [of] why the price difference existed, or to what extent it was a result of Pom's actions."); *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1118-19 (C.D. Cal. 2015) (concluding that plaintiffs failed to present a damages methodology that could both "determine the price premium attributable to NJOY's use of the misleading advertisements and product labeling omissions" and also satisfy *Comcast*); *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 5794873, at *13 (N.D. Cal. Nov. 6, 2014) ("In the end, it is not enough for Brazil or Dr. Capps to just say that the Regression Model controls for other factors; Brazil must show the Court that the model can. Brazil has not done so. Thus, Brazil has not met his burden to show that the model he proposes is capable of controlling for all other factors and isolating the price premium attributable to Dole's 'All Natural Fruit' label only.").

Dr. Dennis' decision to exclude from his Surveys a wide selection of variables that likely impacted the price consumers were willing to pay for Benecol undermines the credibility of any price-premium opinions he and Dr. Weir draw from his Surveys. Consequently, not only are those opinions unable to credibly establish a class-wide damages model (as Plaintiff must present to support class certification, but Dr. Dennis' flawed survey-based opinions should be excluded in their entirety under *Daubert* and Fed. R. Evid. 702.

**C. The Dennis Surveys Suffer From Other Methodological Flaws that Are Fatal to Their Admissibility.**

The Dennis Surveys fail to meet accepted standards for clear, precise, and unbiased questions. *See* Shari Seidman Diamond, *Reference Guide on Survey Research*, in Reference Manual on Scientific Evidence (3rd ed. 2011), at 248-49, attached as Ex. K to Villalobos Dec. (discussing how questions on survey must be framed to be "clear, precise, and unbiased"); *see also James Burrough Limited v. Sign of the Beefeater, Inc.*, 540 F.2d 266, 279 (7th Cir. 1976) (survey results were problematic because they were from questions that were not asked in a "specific, limited, probative context"); *Hodgdon Powder Co. v. Alliant Techsystems, Inc.*, 512 F. Supp. 2d 1178 (D. Kan. 2007) (confusing questions made survey inadmissible).

16

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

The lack of clear, easily ascertainable questions is a flaw that permeates the Dennis Surveys. From the start, even the qualifying questions are confusing, making it difficult for respondents to answer and undermining the accuracy of their responses. *See* Isaacson at ¶¶ 80-83. Respondents were asked to remember whether they purchased a "Butter or margarine substitute" in the past 10 years, instead of during the relevant 2008-2011 class period. *Id*. at ¶ 79. Ten years is a very long period of time for a survey respondent to remember when they purchased an inexpensive, every day staple, and consumers who are not frequent purchasers of such spreads may have difficulty remembering whether their purchase occurred within the past five years. *Id*. This issue was exacerbated by the fact that it is unclear whether other qualification questions in the Surveys were also qualified by a 10-year time period, or whether they were time period-agnostic. *Id*. at ¶¶ 80-81. Questions on page 45 of the Dennis Declaration illustrate the problem:

> Please tell us about some food products you have or have not purchased in the last 10 years.
>
> Have you purchased, or not purchased, any of these food products for your personal use? Some of these are not common food products, so please select YES only if you are absolutely sure you purchased the product in the past, and select NO if you did not purchase the product or if you are not sure.

The initial part of this question asks about a 10-year period, but the rest of the question does not reference a time frame. The question only asks respondents ". . . if [they] are absolutely sure [they] purchased the product in the past," but does not specify whether this refers to purchases made in the past 10 years, or ever. *Id*. at ¶ 80.

The Dennis Surveys also contain numerous hopelessly vague questions with undefined and confusing terms. For example, the conjoint survey asks respondents about "Plant Stanol Esters" and "Plant Sterol Esters" without defining these terms or asking whether respondents knew what the terms mean, let alone whether they understood the benefits of those ingredients. *Id*. at ¶ 59. The Surveys also fail to disclose what constitutes a cholesterol-lowering spread or define the terms trans fats and trans fatty acids—the only representations at issue in this case. In addition, while the conjoint survey asks respondents to choose between spreads containing different percentages of vegetable oil, the survey fails

17

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

to disclose the impact, if any, of vegetable oil on the no trans fats and no trans fatty acids claims at issue. Lastly, many of the questions in the Dennis Surveys, including the qualifying questions discussed above, fail to set forth a relevant time period, and others ask respondents to recall purchases that took place over the past 10 years, while failing to inquire about purchases made during the putative class period.

The questions in the Dennis Surveys are also confusing and imprecise. For this independent reason, the Dennis Declaration, including the Surveys, should be excluded in their entirety as unreliable. *See Berk v. St. Vincent's Hospital and Medical Center*, 380 F. Supp.2d 334, 354-355 (S.D.N.Y. 2005) (exclusion of expert testimony is warranted where the expert offers no explanation for his "conclusory opinions" and "categorical statements" "that would withstand adversarial scrutiny"); *Santoro v. Donnelly*, 340 F. Supp.2d 464, 475 (S.D.N.Y. 2004) (expert testimony inadmissible for failure to explain "how and why [he] could have extrapolated [his] opinion from the data"); *Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224, at *13 (N.D.N.Y. Sept. 28, 2000) (expert's opinion failed to qualify for consideration on a summary judgment motion because it would result in a juror's reliance "on little more than conclusory evidence").

## V. CONCLUSION

The extensive and irredeemable deficiencies in the Dennis Surveys are fatal to the Surveys and Dennis Declaration and both should be excluded from this case.

///

///

///

///

///

///

///

///

///

///

///

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

DATED: October 2, 2017

TUCKER ELLIS LLP

By: /s/ Ronie M. Schmelz

Mollie F. Benedict - SBN 187084
mollie.benedict@tuckerellis.com
Ronie M. Schmelz – SBN 130798
ronie.schmelz@tuckerellis.com
Amanda Villalobos - SBN 262176
amanda.villalobos@tuckerellis.com
515 South Flower Street
Forty-Second Floor
Los Angeles, CA 90071-2223
Telephone:213.430.3400
Facsimile: 213.430.3409

Attorneys for Defendants MCNEIL NUTRITIONALS, LLC and JOHNSON & JOHNSON

19

DEFENDANTS MCNEIL NUTRITIONAL, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION TO EXCLUDE THE DECLARATION OF J. MICHAEL DENNIS, PH.D.

1299266.4

TUCKER ELLIS LLP
Cleveland ♦ Columbus ♦ Denver ♦ Los Angeles ♦ San Francisco

## CERTIFICATE OF SERVICE

This Certificate of Service is made in compliance with Local Rule 5.1.2 and Civ.R. 5(b). I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business address is 515 South Flower Street Forty-Second Floor, Los Angeles, CA 90071-2223.

On the date indicated below, a true and correct copy of the foregoing **DEFENDANTS MCNEIL NUTRITIONALS, LLC AND JOHNSON & JOHNSON'S NOTICE OF MOTION AND MOTION TO EXCLUDE PLAINTIFF'S SURVEYS AND EXPERT TESTIMONY OF J. MICHAEL DENNIS, PH.D.** was filed with Court and served electronically and will be available for viewing and downloading from the Court's CM/ECF system:

The Notice of Electronic Case Filing automatically generated by the system and sent to all parties entitled to service under the Federal Rules of Civil Procedure and the Local Rules of the District of California who have consented to electronic service shall constitute service of the filed document to all such parties.

Executed on, **October 2, 2017**, at Los Angeles, CA.

I declare under penalty of perjury that I am employed in the office of a member admitted to practice and ECF registered in this Court at whose direction the service was made and that the foregoing is true and correct.

By *\/s/ Ronie M. Schmelz*
Ronie M. Schmelz