# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

JOANN MARTINELLI, individually and on behalf of all others similarly situated,

Plaintiffs,

vs.

JOHNSON & JOHNSON and McNEIL NUTRITIONALS, LLC,

Defendants.

No. 2:15-cv-01733-JAM-DAD

- - - -

CONTAINS CONFIDENTIAL PORTIONS
VIDEOTAPED DEPOSITION OF JOANN MARIE MARTINELLI
Held at the Holiday Inn Auburn
120 Grass Valley Highway, Grass Valley, California
Tuesday, May 24, 2016, 10:53 a.m.

- - - -

REPORTED BY: ELAINA BULDA-JONES, CSR No. 11720

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

like we talked about earlier, but when I ask you, "Do you know," I'm just asking whether you personally know.
[redacted]
A. I don't know.
Q. [redacted]
A. I don't.
(END CONFIDENTIAL PORTION)
MS. SCHMELZ: Let's go off of the confidential designation now, if we can.
Q. Could you please state your full name and your address for the record?
A. Joann Marie Martinelli, [redacted]
Q. Now, you said you have never had your deposition taken before.
Have you ever been a party to a lawsuit before?
A. I have not.
Q. Have you ever been convicted of a crime?
A. No.

Q. What did you do to prepare for your deposition here today?
MR. KRIVOSHEY: Objection. Vague.
BY MS. SCHMELZ:
Q. Do you understand the question?
A. I'm sorry. I thought I heard Yeremey say something.
Q. He's going to state something for the record. You can just ignore that.
A. Oh, okay.
Q. So what did you do to prepare for your deposition here today?
MR. KRIVOSHEY: Objection. Vague.
THE WITNESS: So answer?
BY MS. SCHMELZ:
Q. Yes, please.
A. Okay. Yesterday I met with Yeremey.
Q. And where did you meet?
A. In this same room.
Q. You met in person?
A. Yes.
Q. Where?
A. In Auburn.
Q. Where in Auburn?
A. Here at the Holiday Inn.

Q. Okay. And what time did you meet?
A. I think it was 11:00.
Q. And do you recall how long the meeting lasted?
A. 3:30. We had lunch, and 3:30 I think it was over.
Q. So it was about a four-and-a-half-hour meeting?
A. Uh-huh.
Q. Was anybody else in attendance?
A. No.
Q. Did you review any documents with Yeremey during this meeting?
A. Documents such as -- I just --
Q. Paper?
A. Yes.
Q. Okay. What did you review?
MR. KRIVOSHEY: Objection. I'm going to instruct you not to answer that based on attorney-client privilege.
MS. SCHMELZ: Okay.
Q. During your meeting when you were reviewing documents, did those documents that you reviewed help you recall events that are the subject of this lawsuit?

There's a Ralphs, which is like a Safeway, in Southern California, where I live. And they have a rewards program, so I can get discount rewards prices off of products --

A. Uh-huh.

Q. -- if I'm a member.

Are you familiar with that kind of program?

A. Safeway will put on their "buy this, get this one half-off" or something like that, yeah, type of thing.

Q. But you have to be a member of their loyalty program.

Do you understand that?

A. Yes, uh-huh.

Q. And are you a member of their program?

A. I have a card. I don't know if it makes me a member.

Q. Do you get the discounted prices?

A. Yes.

Q. Okay. So I think you are a member to get the discounted prices.

A. Okay.

Q. Other than the Safeway -- I'm just going to call it rewards program.

Will you understand what I mean by that?
A. Right.
Q. Other than the Safeway rewards program, do you know if Raley's has one?
A. I don't know.
Q. You don't have one that you know of?
A. I don't, no, huh-uh.
Q. What about Wal-Mart?
A. Wal-Mart does not have any program that I'm aware of.
Q. Okay. So when you go to Safeway, do you input your rewards number or information in order to get the discounted price?
A. Phone number.
Q. Phone number. And that gets you the discounted prices?
A. I believe so.
Q. Okay. Do you clip coupons?
A. No.
Q. Let's go back, if we can, to this lawsuit.
You indicated that you first spoke with your lawyers in this case, the Bursor & Fisher firm, in connection with the Safelight diet product.
A. Uh-huh.
Q. "Yes"?

A. Yes.
Q. Do you recall when that engagement ended; in other words, there was some sort of resolution of the Safelight?
A. I do not.
Q. Okay. Do you recall when you first spoke again to the Bursor & Fisher firm in connection with this lawsuit?
A. 2015.
Q. And do you recall who you spoke with?
A. Timothy L. Fisher.
Q. And did you call him or did he call you?
A. I believe he called me.
Q. And prior to him calling you, had you had any issues with Benecol?
MR. KRIVOSHEY: Objection. Vague.
BY MS. SCHMELZ:
Q. Prior to Mr. Fisher calling you in 2015 about this lawsuit, had you had any conversations with anybody else about Benecol products?
A. No.
Q. So the first time you had any conversation with anybody about the issues that are raised in this lawsuit is when you spoke to Mr. Fisher in 2005 after he called you, correct?

you estimate?
A. Yes.
Q. And were all of your phone calls of that duration, or were some shorter?
A. I would say that duration.
Q. Do you ever take -- did you take any notes of your conversation with Mr. Fisher?
A. No.
Q. How often do you use e-mail?
A. Oh, I e-mail my friends. I e-mail quite frequently.
Q. Would you say you e-mail every day?
A. No.
Q. What -- where do you have an e-mail account?
A. Where?
Q. Yeah, what is your e-mail address?
A. [redacted]
Q. And how long have you had that e-mail site -- that e-mail address?
A. Ten years, probably.
Q. Do you recall how long after your first conversation with Mr. Fisher in August of 2015 the lawsuit against Johnson & Johnson and McNeil Nutritionals was filed on your behalf?

A. It would be August.
Q. So the same month that he called you was the month that the lawsuit was filed?
A. Yes, I believe so.
Q. Do you recall how much time passed between your phone conversation and the filing of this lawsuit?
A. I do not.
Q. Did you provide Mr. Fisher with any documents prior to the filing of this lawsuit?
A. No.
Q. Do you have any documents relating to your purchases of Benecol?
A. No.
Q. Do you tend to maintain receipts of your grocery purchases?
A. I do not.
Q. Do you review your receipts?
A. I do when I think -- if the total is too much, I do.
Q. And will you review it at the place of purchase?
A. Correct.
Q. And -- but you don't always do that?
A. No.

Q. And what happens to the receipt after you -- if you do review it, what happens to the receipt after you have reviewed it?
A. I take it up to the cashier and ask her to check it.
Q. Does that happen often?
A. No.
Q. And so what is your normal practice once you get a receipt after having made a purchase?
A. Throw it away.
Q. You don't maintain any files at home of any of your credit card purchases?
A. Like at Macy's and Nordstrom's, things like that?
Q. Correct.
A. Yes.
Q. But not of any grocery purchases?
A. No.
Q. Other -- after your phone call with Mr. Fisher in August of 2015, between that time and the filing of the lawsuit, did you do anything else in connection with this lawsuit?
A. No.
Q. You didn't review any documents before the lawsuit was filed?

product.

Q. Other than reading the Benecol label, do you recall ever reviewing any other label on a food product?

A. And I didn't read the label. I just read --

MR. KRIVOSHEY: Let her finish.

THE WITNESS: Okay.

BY MS. SCHMELZ:

Q. Other than Benecol, do you recall reading any other product labels prior to purchasing a product, food product?

A. No.

Q. So Benecol is the only time that you read the label, and by "label" I mean what is on the product itself, prior to making a purchase?

A. No, I didn't read the label on the back of the Benecol. I read the front, where it said no trans fat, which I thought was good.

Q. And when do you recall reading the front of the Benecol product and seeing "no trans fat"?

A. When I saw it in the store and it had the little heart on it, and it said, "no trans fat."

Q. Do you recall when that was?

A. Years ago. Years ago now.

Q. Twenty years ago?
A. Twenty, no.
Q. Fifteen years ago?
A. Fifteen years ago, I -- good question. I don't recall.
Q. Do you recall what went into your decision to purchase Benecol?
A. Uh-huh.
Q. What?
A. [redacted]
And when it said "no trans fat," and it had the little heart on it, I just connected the two as being healthy.
Q. And do you have an understanding as to what "no trans fat" means?
A. Well, it shouldn't have the fats in it.
Q. So when it says "no trans fat," you think it's a product that contains no fat; is that correct?
MR. KRIVOSHEY: Objection. Mischaracterizes testimony.
BY MS. SCHMELZ:
Q. I just want to understand what you understand by the term.
What does it mean when it says "no trans

fat"?

A. It would have no bad properties like hydrogenated things to help my husband's cholesterol. It says "no trans fat." I put that with my husband's -- that's just me.

Q. Okay. Sitting here today, can you tell me what the term "no trans fat" means to you? What do you understand that term to mean?

A. That it would have a high cholesterol content.

Q. And how did you gain that understanding?

A. Just by "no trans fat," would have a high cholesterol if it had these properties in it, just to me.

Q. Okay. You haven't taken any nutrition classes, correct?

A. No.

Q. And you haven't read articles on nutrition, have you?

A. No.

Q. Have you read articles on trans fats?

A. You know, no.

Q. And have you read articles on cholesterol?

A. No.

Q. You don't subscribe to health magazines?

A. No.
Q. And you didn't go to college?
A. No.
Q. I'm trying to understand, just based on your background, how you gained an understanding of what "no trans fat" means?
A. Probably just by listening to TV, and they say, "No trans fats. High in cholesterol." I mean, that's drilled into everybody every day.
Q. So based on TV ads that you have seen, you equate no trans fat as being something that is high in cholesterol, correct?
A. Correct.
Q. And that's what you wanted to purchase for your husband?
That's the kind of product you wanted to purchase for your husband?
A. Something with no trans fats, yes.
Q. And what other no trans fat products have you purchased for your husband?
A. I believe the Weight Watchers little cakes have no trans fat.
Q. Can you describe those again to me? I'm trying to understand. Is it a -- like a cupcake?
A. They are little cakes. They have carrot

Q. Do you recall how long you have been concerned about hydrogenated being in a product?
A. No.
Q. Do you understand hydrogenated to be an ingredient?
A. I'm not a chemist. I don't know what a hydrogenated is, but I think it's a preservative.
Q. And do you know what these preservatives do?
A. They give a lot of foods a long shelf life.
Q. Do you know the names of any of these preservatives?
A. No.
Q. Have you ever heard the term "partially hydrogenated oil"?
A. Yes.
Q. What do you understand that term to mean?
A. I don't.
Q. Okay. Do you know whether any of the products you have purchased have partially hydrogenated oils in them?
A. No.
Q. You have indicated that you purchased the Benecol product.

Which products did you purchase?
A. The light and the regular spread, both. I purchased both.
Q. You purchased both?
A. Uh-huh.
Q. And how often would you purchase Benecol products?
A. Whenever we ran out.
Q. How often did you go through Benecol?
A. Two to three weeks, maybe. It depends on the cooking habits, what I'm cooking, what I'm preparing.
Q. And at the time you were purchasing Benecol -- and I think I recall you saying that you don't remember when you first started buying Benecol; is that correct?
A. That's correct.
Q. Do you recall when you last bought Benecol?
A. Probably -- probably 2015.
Q. So do you recall whether you were using Benecol at the time that you -- Mr. Fisher called you about this lawsuit?
A. No.
Q. At the time that you were purchasing

Benecol, were you also purchasing Land O'Lakes or were you using Benecol exclusively?
A. I used Benecol quite a bit. I don't recall.
Q. You don't recall if you were using any butter products other -- do you understand Benecol to be a butter or a margarine?
A. I understand it to be a margarine.
Q. Okay. So during the time you were using Benecol, were you also using butter for cooking and for baking?
A. Yes.
Q. And would that have been either the Land O'Lakes or the Irish butter?
A. Correct.
Q. When did you start using I Can't Believe It's Butter (verbatim)?
A. Oh, when? I can't give you a date when.
Q. Were you using I Can't Believe It's Butter (verbatim) at the same time you were purchasing Benecol?
A. Yes.
Q. And after you stopped purchasing Benecol, did you replace it with any other different product?
A. I Can't Believe It's Not Butter.

Q. So you just continued to use that more?
A. Uh-huh, right.
Q. Do you know whether or not I Can't Believe It's Butter (verbatim) contains any trans fats?
A. I don't know.
Q. What about Land O'Lakes?
A. I don't know.
Q. And Irish butter?
A. I don't know.
Q. And you never checked the labels to see whether or not they contained trans fats, correct?
A. I never did.
Q. And you never checked any of the labels of I Can't Believe It's Not Butter, Land O'Lakes, or Irish butter to determine whether or not it contained partially hydrogenated oils, correct?
A. Correct.
Q. And you never checked the label of Benecol to see whether or not it contained partially hydrogenated oils, correct?
A. Correct.
Q. At the time that you were purchasing the Benecol, do you know whether or not there were any other margarine products on the market that did not contain trans fats?

MR. KRIVOSHEY: Objection. Calls for speculation.

THE WITNESS: Could you repeat that, please?

BY MS. SCHMELZ:

Q. Yeah. I'm trying to find out whether or not there were products comparable to Benecol while you were purchasing the Benecol product.

In other words, you said you saw the Benecol statement that there were no trans fats and that is why you purchased the product, correct?

A. Uh-huh.

Q. "Yes"?

A. And it had -- it had the little heart on it, which --

Q. And do you know whether there were any other products during this time period which also were free of trans fat?

A. I don't know.

Q. You don't recall looking for any other products that were free of trans fat at this time?

A. I don't. I didn't.

Q. You indicated that you read the -- and I use "read" loosely.

You indicated that you saw the heart and

the no trans fat statement on the Benecol label, correct?
A. Correct.
Q. And is that the first time, when you saw that, that you learned that Benecol did not have trans fat in it?
A. Okay. That's confusing to me, what you just said.
Q. Okay. Had you ever heard of Benecol -- had you -- had -- strike that.
Had you ever seen any advertisements for Benecol before you purchased it in the market?
A. No.
Q. And is the first time that you learned that the product contained no trans fat was when you saw it in the market?
A. Correct.
Q. And other than this statement, did you -- were there any other factors that went into your decision as to whether to purchase Benecol?
A. I told you that [redacted] is the factor.
Q. Okay. And you continued to purchase Benecol, correct?
A. Correct.

Q. And why would you distinguish between when you purchased the light or the regular Benecol?
A. There was no distinction. They both taste the same.
Q. What is your understanding as to the difference, if any, between those two products?
A. The calorie content.
Q. And did you review the calorie content?
A. No.
Q. And you continued to purchase Benecol because of the no trans fat statement, correct?
A. Correct.
Q. And was it something you found tasty?
A. Yes.
Q. And your husband enjoyed the taste as well?
A. Yes.
Q. And did you bake with it as well?
A. No, I didn't bake with it.
Q. So other than putting it on your bagel, how else would you use --
A. Waffles, oh. Whatever daily foods. If I scrambled eggs, I would use it to scramble eggs. Whatever daily use that I use the product for.
Q. Do you recall whether or not the label of

the product, either Benecol or Benecol Light, ever changed?
A. No.
Q. Do you recall seeing more than one label, or was the label always the same when you were purchasing the product?
A. To my recollection, the label always looked the same.
Q. There became a point in time in which you realized that Benecol contained trans fat; is that correct?
A. Yes, that's correct.
Q. And when was that?
A. When I was talking with --
MR. KRIVOSHEY: Sorry, I'm going to instruct you not to disclose anything you talked about with your attorneys.
BY MS. SCHMELZ:
Q. Did you first learn that Benecol contained trans fat in August of 2015?
A. Correct.
Q. And when you learned that -- well, strike that.
What did you learn about the product in 2015 and its content of trans fat?

A. That the product seemed to be mislabeled.
Q. In what way?
A. That it contains trans fat.
Q. And after learning that, did you purchase Benecol again?
A. No.
Q. Did you go to the supermarket and try to return the product?
A. No.
Q. Did you ask anybody for a refund on the product?
A. No.
Q. Did you ever communicate with any of the defendants in this case about Benecol and the ingredients in the product?
MR. KRIVOSHEY: Objection. Vague.
THE WITNESS: "The defendants" meaning?
BY MS. SCHMELZ:
Q. Johnson & Johnson or McNeil.
A. Oh, no.
Q. Do you recall, when you learned that Benecol had trans fats in August of 2015, whether you were still using the product at that time?
A. I was not.
Q. Do you recall how long before that you

stopped using it?
A. No.
Q. Do you recall why you stopped purchasing Benecol?
A. No. My shopping habits change, like my hairdressers.
Q. Do you have -- is there any way that you can recall -- strike that.
Do you recall how many years you purchased Benecol?
A. I know -- how many years -- how many years? Probably five or six years. That's just a guess on my part.
Q. Okay.
A. I'm trying to...
Q. And during this five- or six-year period you were also purchasing I Cannot Believe It's Not Butter, correct?
A. Uh-huh.
Q. "Yes"?
A. Yes.
Q. As well as those two butter products you have identified, correct?
A. Yes.
Q. What exactly -- there was a heart, you

indicated, a diagram of a heart, like a love sign, I would imagine.
Is that what you were doing with your hand to describe what was on the label?
A. On the Benecol label?
Q. Yes.
A. Yes, they have a little heart, and then a half a heart. And the only reason I know that is because my birthday is Valentine's Day, so I notice a lot of hearts. And then the no trans fats insignia.
Q. Did you ever discuss with your physician, [redacted] the importance of trans fats in your diet?
A. No.
[redacted]
Q. Do you recall how Benecol appeared in the store? It was in a tub?
A. It was in a tub.

Q. And was it one size, more than one size, do you recall?
A. It came large and a smaller one.
Q. Two sizes?
A. Uh-huh.
Q. I'm sorry. You need to speak orally.
A. Yes, I believe two sizes.
Q. And so each -- Benecol and Benecol Light, each came in two different sizes?
A. The light, I recall, was in a small tub.
Q. But Benecol had two sizes?
A. Yes.
Q. And your recollection is that during the time period you were purchasing the product, both of those products in all the different sizes had the heart and no trans fat insignia, correct?
A. Correct.
Q. Do you recall any other words or language on the label of either the Benecol or Benecol Light, other than the heart and the no trans fat insignia?
A. No.
Q. Other than the tub, was there any other packaging with Benecol; do you recall?
A. No.
Q. So it was just the tub, there was no outer

box?
A. I don't know what you mean by "outer box."
Q. Sometimes tubs might be inside of a paper box or container with outside packaging.
Nothing like that?
A. No.
Q. It was just the tub?
A. Yeah.
Q. Was there a -- any written sleeve or extra materials on the tub that you can recall?
A. Not that I can recall.
Q. Do you recall how much you paid for Benecol products?
A. I believe it was around $4.
Q. Was that for the large or the small size of the Benecol?
A. The large.
Q. And the small; do you recall?
A. No.
Q. And what about the Benecol Light, do you recall how much you paid for Benecol Light?
A. I believe it was $4 as well.
Q. And do you recall whether or not the price changed at any of the time period that you were purchasing Benecol?

A. I wasn't aware.
Q. So the price was pretty constant, to your recollection?
A. Correct.
Q. Do you recall where you purchased Benecol products?
A. Like I told you, Raley's, Safeway, and at Wal-Mart, too.
Q. Did you purchase it at Trader Joe's?
A. No.
Q. Where do you tend to shop more, Raley's, Safeway, or Wal-Mart, for food?
A. Neither one. It's whatever -- if I'm going down the hill to the mall, I'll stop at Raley's. If I'm up here, I'll go to Safeway. If I'm coming back up the hill, I'll stop at Wal-Mart. No, I have no specific.
Q. So you would say that you shop there probably one-third, one-third, one-third, or does one tend to be more than the other?
A. No, not one more than the other.
Q. Do you claim that you have been injured as a result of your purchase of the Benecol products?
A. No.
MR. KRIVOSHEY: I am going to object to

that as calling for a legal conclusion.
BY MS. SCHMELZ:
Q. Do you contend that you have lost any money as a result of purchasing Benecol products?
MR. KRIVOSHEY: Same objection.
THE WITNESS: I'm sorry. Restate that, please.
BY MS. SCHMELZ:
Q. Do you claim you have lost any money as a result of having purchased Benecol products?
A. Yes, I lost my purchase price.
Q. You used the Benecol products that you purchased, correct?
A. Correct.
Q. And you enjoy the taste of the Benecol?
A. Correct.
Q. And you enjoy eating it?
A. Correct.
Q. And the price of Benecol was not a factor in whether to purchase the product, correct?
A. Correct.
Q. Is it your understanding that if you prevail in this lawsuit, you will be entitled to get back all the money you paid for Benecol products?
MR. KRIVOSHEY: Objection. Calls for a

MR. KRIVOSHEY: Objection. Calls for a legal conclusion.
BY MS. SCHMELZ:
Q. Do you have that understanding?
A. I'll let my attorney speak to that.
Q. I'm asking your understanding.
Do you know that if you don't prevail and the defendants win in this lawsuit, you must -- you may be on the hook for the attorney's fees --
A. Yes.
Q. -- in this case?
You do understand that?
A. Uh-huh, yes.
Q. And what is your understanding in that regard?
A. Just what you stated.
Q. And is it your understanding that you are going to have to pay the defendants' attorneys' fees?
A. Yes.
Q. As well as your own lawyer's attorney's fees?
A. Yes.
Q. I'm going to have introduced as Exhibit 1 to your deposition a document that the court

reporter is going to mark and then I'll have you take a look at.

(Whereupon, Exhibit 1 was marked for identification.)

THE WITNESS: Okay. I need my glasses to see.

BY MS. SCHMELZ:

Q. Let me know when you have had a chance to review that, if you would, Ms. Martinelli.

A. Okay.

Q. Ms. Martinelli, I have asked the court reporter to mark and you have now reviewed what we have had marked as Defendants' Exhibit No. 1.

This is a six-page document, which is entitled on the first page: "Second Amended Notice Duces Tecum of Plaintiff Joann Martinelli."

Do you see that?

A. Yes.

Q. And have you seen this document before today?

A. Yes, I have.

Q. Did you -- is this one of the documents you reviewed yesterday?

A. Yes.

Q. And I would like to draw your attention to

Exhibit A, which is on the third page of this document. And toward the bottom there, it says, "Request for Production."
Do you see that?
A. Request for Production, okay.
Q. Was yesterday the first time you saw this document?
A. Yes.
Q. Now, Request For Production No. 1 states -- it states, "Any and all documents or information concerning Benecol, including but not limited to information concerning the use of partially hydrogenated oils in Benecol."
Do you see that?
A. Yes.
Q. Did you understand that defendants were requesting copies of any documents that you might have in response to these requests?
A. Yes, they asked for my grocery receipts, which I didn't have.
Q. Okay. But did you go and do anything to try to see if you had any documents relating to Benecol at all?
A. I went through my little folders, but I only had Macy's and Nordstrom's. I don't have

grocery receipts.

Q. Upon receiving this request and seeing it yesterday, were you asked to go back and see if you could find any documents responsive to this Request No. 1?

MR. KRIVOSHEY: Objection. I am going to instruct you not to answer that question based on the attorney-client privilege.

BY MS. SCHMELZ:

Q. Did you go back and determine whether or not you have any documents responsive to Request No. 1 after you reviewed this yesterday?

A. Are you asking me if I went and looked for more grocery receipts?

Q. I'll ask a different way.

You reviewed this document for the first time yesterday, correct?

A. Correct.

Q. And after seeing that Request No. 1, did you do anything to determine whether or not you had any documents responsive to this request?

A. No.

Q. Okay. Let's go to the next page. Request For Production No. 2. "Any and all product labels and product packaging materials concerning Benecol,

including but not limited to the labeling and packaging plaintiff saw that Benecol was labeled as having 'no trans fats,' and 'no trans fatty acids' as alleged in Paragraph 7 of the first amended class action complaint filed in this action."

Do you see that?

A. Yes.

Q. And after you heard or read that for the first time yesterday, did you then do anything to determine if you had any documents responsive to this request?

A. No.

Q. Request No. 3 reads, "Any and all documents reflecting the representations and warranties relied on by plaintiff in deciding to purchase Benecol as alleged in Paragraph 7 of the complaint."

After you read this request for the first time yesterday, did you do anything to go back and determine if you had any documents responsive to this request?

A. Isn't that the same question that you just asked me?

Q. I just read --

A. Okay. No.

Q. -- Request No. 3.

Did you do anything to see if you have documents responsive to Request No. 3 after you read this yesterday?

A. No.

Q. And Request No. 4 seeks, "Any and all documents reflecting the tangible increased cost plaintiff paid for Benecol as alleged in Paragraph 7 of the complaint."

After you read that for the first time yesterday, did you do anything to determine whether you have any documents responsive to that request?

A. No.

Q. Request No. 5 reads, "Any and all documents concerning plaintiff's purchase of Benecol, including but not limited to store receipts from Safeway and Raley's stores located in Roseville, California, credit card receipts, and other purchase records and documents sufficient to show the retail price paid by plaintiff for Benecol."

After you read that request for the first time yesterday, did you do anything to go back and determine whether you had any documents responsive to that request?

A. No.

Q. Request No. 6 reads, "Any and all documents concerning any communications or correspondence between plaintiff and defendants or any representative of defendants."

After you read this request for the first time yesterday, did you do anything to determine whether you have documents responsive to this request?

A. No.

Q. Request No. 7 reads, "Any and all documents that were provided by -- to plaintiff by defendants or any representative of defendants."

After you read this document and this request yesterday, did you do anything to determine whether you had any documents responsive to this request?

A. No.

Q. Request No. 8 reads, "Any and all documents related to any alleged health risks or hazards associated with consumption of partially hydrogenated oils."

After you read this request for the first time yesterday, did you do anything to determine whether you have any documents responsive to this

request?

A. No.

Q. Request No. 9 reads, "Any and all advertisements or other marketing materials concerning Benecol viewed by plaintiff."

After reviewing this request yesterday for the first time, did you do anything to determine whether you had any documents responsive to this request?

A. No.

Q. And, finally, Request No. 10 asks for, "Any and all documents and communications with third parties, including but not limited to other putative class members, concerning the allegations set forth in the complaint."

After you read this request for the first time yesterday, did you do anything to determine whether you have any documents responsive to this request?

A. No.

Q. As you sit here today, do you believe that you have any documents that are responsive to these requests that have not been provided to your counsel?

A. Right. I do not have any grocery

receipts, correct.
Q. Do you have any labels?
A. No.
Q. Do you have any materials discussing trans fats?
A. No.
Q. Or any documents relating to the use of partially hydrogenated oil?
A. No.
Q. Do you have in your possession at home a copy of the complaint that was filed in this action?
A. I believe I do, a copy of the complaint.
Q. Let me show you now what has been marked as Exhibit -- what we're going to have marked as Exhibit 2 to your -- your deposition.
(Whereupon, Exhibit 2 was marked for identification.)
MS. SCHMELZ: While she is reviewing that, let's go ahead and mark 3.
(Whereupon, Exhibit 3 was marked for identification.)
(Whereupon, a brief discussion off the record.)
THE WITNESS: Did you want me to review this? I have this --

BY MS. SCHMELZ:

Q. Okay.

A. I have this.

Q. Well, why don't we put both in front of you.

A. Okay.

Q. We now have marked as Exhibit 2 to your deposition a -- I think it's a 23-page document which is a class action complaint.

A. Which one am I looking at now, 2 or 3?

Q. Looking at Number 2.

A. Okay.

Q. Okay. That one should be marked, and it says on there, "Class Action Complaint."

Do you see that?

A. Yes.

Q. And if you take a look at Number 3, it's the one that says, "First Amended Class Action Complaint"?

A. Correct.

Q. Okay. So I'm going to ask you about these. Let's start with Number 2.

Do you recall seeing what we have marked as Exhibit No. 2, which is the original complaint that was filed in this case?

second time. And now this time, whatever improvements they have, we'll go from there.
Q. Do you recall that this was a program that you watched in connection with you and [redacted]
A. No, we discussed that with the [redacted].
Q. And were you present at that meeting with the [redacted]?
A. Yes.
Q. And was there any talk with the [redacted]?
A. [redacted]
Q. [redacted] the second one that you were married to him for?
A. [redacted]
Q. 2006?
A. It was around Christmas.
Q. Christmas 2006?

A. Yes.
Q. Is that your best estimate?
A. My best -- yes, uh-huh.
Q. Okay. And at the time of [redacted], do you remember knowing about the term "trans fat"?
A. No.
Q. And how about partially hydrogenated oils?
A. No.
Q. Do you know whether that was even something that was part of advertising of foods at all?
A. No.
Q. You don't know when that became a thing, do you?
A. No.
Q. Okay. Other than the [redacted] there any other medical conditions that you or your husband suffer?
A. No.
Q. As you sit here today, can you recall seeing any products other than Benecol which claim to have no trans fat?
A. I think I remember seeing potato chips, but that would be a guess on my part. I think the

potato chips said no trans fat, but I don't buy, I just -- I think.
Q. So are you not sure?
A. No.
Q. And you can't recall as you sit here today?
A. No.
Q. And do you know whether or not today there are products that are marketed with trans fats?
A. With what now?
Q. With trans fat.
MR. KRIVOSHEY: Objection. Vague.
BY MS. SCHMELZ:
Q. Do you know today -- as you sit here today, do you know if there are any other products on the market that are marketed with trans fat as an ingredient?
A. No.
Q. Do you know whether or not there are products on the market today that contain partially hydrogenated oils?
A. No.
Q. You indicated that you purchased Benecol products, both the light and the regular, over a five- or six-year time period, correct?

A. At least, yeah.
Q. Pardon?
A. Yes.
Q. And there was never a reason to purchase either the light or the regular, was there?
A. No.
MR. KRIVOSHEY: Objection. Mischaracterizes the testimony.
BY MS. SCHMELZ:
Q. So what would prompt you to purchase the light over regular at any point in time?
A. What would prompt me?
Q. Yes.
A. Nothing, just my mood.
Q. Okay. But they tasted the same to you, correct?
A. Yes.
Q. So just other than on a whim, there was no reason to pick one over the other, correct?
A. Correct.
Q. And you recall as you sit here today that during the five- or six-year period that you were purchasing Benecol products, both the regular and the light, that the label had the no trans fat heart logo that we saw on the complaint, correct?

A. Correct.

Q. And during the five- or six-year period that you were purchasing the product, do you recall ever purchasing a product that didn't have that logo on it or that no trans fat statement?

MR. KRIVOSHEY: Objection. Vague.

THE WITNESS: Are you referring to Benecol?

BY MS. SCHMELZ:

Q. Yes, I'm sorry, yes.

A. Okay. You are asking me if I purchased it when it didn't say no trans fat?

Q. Yeah. Let me ask you a different way.

A. Okay.

Q. You have indicated that the reason you bought it for the first time was because you saw the no trans fat and heart statement, correct?

A. Correct.

Q. And you saw that in both the Benecol Spread and the Benecol Light Spread, correct?

A. Correct.

Q. And do you recall seeing that no trans fat and heart statement on the Benecol Spreads every time you purchased the product?

A. Yes.

Q. And the product label didn't change at any point in time during your purchasing period, correct?
A. It may have changed, but I only purchased the no trans fat.
Q. So you didn't purchase any Benecol product that didn't have that statement on it, correct?
A. That's correct.
Q. Okay. So if the labels changed at any point in time so that that statement was no longer there, you would have not and you did not purchase the products, correct?
A. Correct.
MS. SCHMELZ: Let's go off the record.
THE VIDEOGRAPHER: We're going off the record at 2:31.
(Whereupon, a brief recess was taken.)
THE VIDEOGRAPHER: We're back on the record at 2:32.
BY MS. SCHMELZ:
Q. Ms. Martinelli, I just have a few more questions before we wrap this up.
Do you recall ever seeing an advertisement for Benecol or Benecol Light?
A. No.

Q. No advertisements in a magazine?
A. No.
Q. No advertisement on the internet?
A. No.
Q. No advertisements for Benecol on television?
A. No.
Q. And you don't recall hearing an advertisement for Benecol on the radio, correct?
A. No.
Q. And you haven't spoken to any other consumer who purchased Benecol, correct?
A. Correct.
Q. And you never spoke to your grocers about Benecol, correct?
A. Correct.
Q. If you would look back at Exhibit 2, page 4 of the complaint, where we see the diagram -- or the copy, if you will, of the Benecol Spread packaging.
A. Page 2. Okay. Are we looking at the -- spread. Okay.
Q. On the upper right-hand corner, it says, "Spread, 55 percent vegetable oil."
Do you see that?

A. Uh-huh.

Q. Do you recall seeing that when you decided to purchase the products?

A. No, I did not.

Q. And is this really the first time you are focusing on it?

A. Yes.

Q. And do you see there this -- in the center it has the Benecol, and then it says, "Proven to reduce cholesterol."

Do you see that?

A. Yes.

Q. Do you recall seeing that before you decided to purchase the product?

A. No, actually, I was looking at the no trans fat and the Benecol. I didn't really pay much attention to the no cholesterol.

Q. So in other words, the only statement on this label that you considered in deciding to purchase Benecol was the one that says no trans fat and the heart, correct?

A. Correct.

Q. And that is the only part of this label that you continued to rely upon in purchasing Benecol in the future, correct?

MR. KRIVOSHEY: Objection. Mischaracterizes the testimony. Vague.

BY MS. SCHMELZ:

Q. Do you understand the question?

A. Yes.

Q. Can you go ahead and answer it for me?

A. Yes.

Q. That is the only reason you continued to purchase it, because you saw that no trans fat heart statement, correct?

A. Correct.

Q. And when it no longer was on the product, you would not have purchased it again, correct?

A. Correct.

MS. SCHMELZ: That's it. I have no further questions.

Enter into a stipulation, the standard?

MR. KRIVOSHEY: I just want to say that I don't know that we were the most careful about testimony regarding her husband's health and her own health issues.

So I just want to preserve that there might be other areas of the testimony that we didn't specifically designate as confidential but that should be designated confidential. And we will do

that as soon as we get the transcript.

I also want to take a -- just a minute break to go off the record to see if I have any questions.

MS. SCHMELZ: Sure. That's fine.

Let's do this. We're not interested in exposing any medical issues or conditions of you or your husband, so why don't we do this.

We'll agree to treat the entire transcript confidential but request of you that within the 30-day review period, that at the end of that, you designate specific pages you want to maintain confidential.

And unless you designate within that time period, the confidential designation of the transcript will be removed.

MR. KRIVOSHEY: Yes, we'll agree to that.

MS. SCHMELZ: Okay.

MR. KRIVOSHEY: Can -- yeah. Can we go off the record?

THE VIDEOGRAPHER: We're going off the record at 2:36.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER: We're back on the record at 2:49.

STATE OF CALIFORNIA )
COUNTY OF YOLO )

I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

JOANN MARIE MARTINELLI,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the ______ day of ____________, 2016.

ELAINA BULDA-JONES, RPR, CSR 11720